IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2015

**SCOTT BENJAMIN CARROLL, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for DeKalb County**
**No. 2011CR48A     David A. Patterson, Judge**

---

**No. M2015-00363-CCA-R3-PC – Filed December 11, 2015**

---

The Petitioner, Scott Benjamin Carroll, appeals the DeKalb County Criminal Court's denial of post-conviction relief from his conviction for initiation of a process intended to result in the manufacture of methamphetamine. See T.C.A. § 39-17-435(a). On appeal, the Petitioner argues that he received ineffective assistance of counsel based on counsel's failure to file a motion to dismiss or request a jury instruction based on the State's destruction of evidence recovered from a methamphetamine laboratory. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Seth B. Pinson, Cookeville, Tennessee, for the Defendant-Appellant, Scott Benjamin Carroll, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin E. D. Smith, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Greg Strong, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner, along with several other individuals, was arrested at his wife's home for initiation of a process intended to manufacture methamphetamine. The following facts, as outlined in his direct appeal, are relevant to the issues presented in this case.

> [The Petitioner] answered the door wearing gloves, and backed up and put
> his hands on his head, seeming to indicate that the detective could come

into the room. Detective Taylor noted that there were two other men, one of whom was Defendant Bustamonte, standing beside a bathroom door, and both of those men were also wearing gloves (footnote omitted). The bathroom door, the detective estimated, was three feet from the bedroom door. [The Petitioner] told the detective, "It's all mine."

Detective Taylor testified that the bathroom and bedroom had a "chemical smell" similar to the smell he had noted at other meth labs. The detective saw two "cookers" in the bathroom that were still burning. He directed Defendant Bustamonte to turn off the burners, and Defendant Bustamonte complied. The detective said he noted that upon each burner was located a bowl that contained a clear liquid. The detective testified that, in the bathroom beside the sink, he also found a twenty-ounce soda bottle with a hole drilled in the top and rubber tubing coming out, which was wrapped in black tape. This type of device, he said, was commonly used for "gas[s]ing off" methamphetamine, turning the methamphetamine from a liquid to a solid.

The detective testified that the only entrance and exit to the bathroom was from the bedroom, and that the Defendants were standing beside the bathroom door, with the bathroom door open.

Detective Taylor testified that, at this point, he read the Defendants their <u>Miranda</u> rights, and then asked them some questions. He asked Defendant Carroll what he meant when he said "It's all mine," and Defendant Carroll pointed the detective toward two bags. The two bags, located approximately six feet from the bathroom, contained more components required for the manufacture of meth. Detective Taylor said he made an inventory of the items he found in the bag[s], and the trial court admitted that inventory list into evidence, over the Defendants' objections. The detective took the two bags outside and took photographs of the bags and their contents, and the photographs were shown to the jury. The detective described the items that were depicted in the pictures of the bags. Detective Taylor testified that all the items contained in the bags were consistent with the manufacture of methamphetamine.

Detective Taylor testified as to the gloves worn by Defendant Bustamonte and [the Petitioner] when he entered the room. He said that, in his experience, those manufacturing meth often wear gloves to protect their hands from getting poked or burned. The detective said that the materials present in the room were ones that would be mixed to make

methamphetamine, and he could not think of any other reason for those items to be grouped together. He further opined that the men were in the "final stages" of manufacturing meth, which he called the "panning" stage.

During cross-examination, Detective Taylor agreed that some of the items he found in the bags in the room with the Defendants had uses other than for producing methamphetamine. He noted that the drain cleaner, turkey baster, and Pyrex dishes were not illegal items. Detective Taylor said that he did not send the liquid from the dishes on the burners to the Tennessee Bureau of Investigations ("TBI") laboratory because the substance was hot and could not be transported safely. The detective testified that he did not find any aphedrine or sudaphedrine packs.

. . . .

Sheriff Ray discussed some of the items found in the bags in the room with the [Petitioner]. He explained that Coke bottles or gas cans with tubing were called "generators." Further, the cold packs could be split open and the contents placed into plastic bags to speed up the cooking process. He noted that the Coleman fuel could have provided the necessary heat source, and the Pyrex dishes were also a common tool used in the manufacture of methamphetamine. The Sheriff testified that those manufacturing meth often wore gloves to avoid burns from the heat and the chemicals used in the process.

Sheriff Ray testified that the final stage of the manufacturing methamphetamine process was turning the liquid created into a powder form of methamphetamine. He said that, during this stage, the pseudoephedrine was contained in the liquid and there would be no pseudoephedrine pills lying around. The Sheriff noted that one method of conducting this final stage involved using a "generator" similar to the one depicted in the photographs taken of the items in the Defendants' possession.

During cross-examination, Sheriff Ray testified that he neither had a degree in chemistry [n]or was an expert in the field of chemistry. He said he never went to the scene of this case but, instead, had only seen pictures taken at the scene. He agreed that many of the items pictured had a use other than for the production of methamphetamine. The Sheriff conceded that the liquid found in this case had not been tested to verify it contained methamphetamine.

-3-

During redirect examination, the Sheriff testified that the manufacture of meth creates an odorless, dangerous gas called phosphane gas. This gas when inhaled can be deadly. He said that if one of his officers made a safety determination that it was too dangerous to test liquid because of the ventilation of the room containing the meth, or for any other reason, he would support that decision.

State v. Fransisco I. Bustamonte and Scott Carroll Jr., No. M2012-00102-CCA-R3-CD, 2013 WL 1907870, at *2-5 (Tenn. Crim. App. May 7, 2013), perm. app. denied (Tenn. Oct. 16, 2013). The trial court sentenced the Petitioner as a Range III, career offender to thirty years with sixty-percent release eligibility. On direct appeal, this court affirmed the conviction and sentence. Id.

The Petitioner filed a pro se petition for post-conviction relief on January 21, 2014. After determining that the Petitioner presented a colorable claim, the post-conviction court entered a preliminary order appointing counsel and setting the matter for an evidentiary hearing. Counsel filed an amended petition on April 24, 2014, and the matter was subsequently heard on January 6, 2015.

**Post-Conviction Hearing.** At the January 6, 2015 post-conviction hearing, the Petitioner testified that he had been hospitalized for a Methicillin-resistant Staphylococcus aureus (MRSA) infection in the days immediately prior to his arrest. He testified that at the time of his arrest, he was boiling water in Pyrex dishes to sterilize towels in an effort to prevent spreading the infection. He stated that the chemicals found on the scene had been given to him approximately twelve hours before and that he was in the process of dumping them out at the time Detective Taylor walked in.

Detective Jeremy Taylor testified at the post-conviction hearing that upon entering the bathroom, he observed the Petitioner, along with two other individuals, standing over two lit burners with Pyrex dishes sitting on top. Detective Taylor stated that he asked the Petitioner to turn off the burners because he "didn't want it to catch on fire or explode." Detective Taylor then arrested the individuals in the bathroom and began gathering evidence from the bedroom the Petitioner had been using. He also notified the Tennessee Methamphetamine Task Force and awaited their arrival prior to removing any "hazardous material," including the liquid in the Pyrex dishes. Detective Taylor testified that he waited for the arrival of the Meth Task Force because he was not trained to remove or dispose of hazardous liquids found at the scene of a suspected methamphetamine lab. He further testified that he was unaware of what the Meth Task Force did with the chemicals after collection. When asked if he feared for his safety, Detective Taylor specified, "[a]s far as the chemicals go, yes. I don't handle the chemicals, I don't want them to explode, I don't want them on me. So that's the reason I let the trained technician do it." Finally,

-4-

Detective Taylor testified that, because methamphetamine had been manufactured in the house, the property was quarantined.

Trial counsel testified that, at the time of the hearing, she had been an attorney for approximately seven years and had handled at least ten cases involving the initiation of the process to manufacture methamphetamine. She testified that she was aware that the State did not have to show the existence of completed methamphetamine in order to convict the Petitioner at trial, but merely the "beginning of the process that's intended to result [in completed methamphetamine], breaking of seals and commercial products can be a part of that." She testified that she was aware that the liquid from the Pyrex dishes had been destroyed, but based on her knowledge of the law regarding the destruction of evidence, she did not believe the State had a duty to preserve those liquids. Accordingly, trial counsel testified that she made a strategic decision at trial to cross-examine the State's witnesses regarding the fact that they destroyed the evidence without testing it, but did not file a motion to dismiss on those grounds. Trial counsel also testified that she decided not to request a jury instruction on the State's duty to preserve evidence because she determined that the subject had been adequately covered on cross-examination.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On January 22, 2015, the post-conviction court entered an order denying relief, and the Petitioner filed a timely notice of appeal.

## ANALYSIS

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see also Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f);

Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance by establishing that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of

circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

On appeal, the Petitioner argues that the post-conviction court erred in finding that he received effective assistance of counsel at trial. Specifically, he asserts that trial counsel was deficient for failing to file a motion to dismiss the charges against him or request a jury instruction on the grounds that the State failed to preserve a sample of the liquid or test results of the liquid that the State claimed was involved in the manufacturing of methamphetamine. The State responds that they had no duty to preserve the liquid, and therefore, counsel was not deficient in failing to file a motion to dismiss or request a jury instruction based on the destruction of evidence.

State v. Ferguson governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d 912 (Tenn. 1999). The proper inquiry is "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair[.]'" State v. Merriman, 410 S.W.3d 779, 785 (Tenn. 2013) (quoting Ferguson, 2 S.W.3d at 914). "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16, or other applicable law." Id. at 917 (internal footnote omitted). The analysis under Ferguson is only triggered, however, if the alleged exculpatory evidence is determined to be material. Id. To be material, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. Once the court determines that the evidence is material and the State failed in its duty to preserve the evidence, Ferguson requires the trial court to consider the following factors which bear upon the consequences of the State's breach of its duty: (1) the degree of negligence involved, (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at trial to support the conviction." Id. (internal footnote omitted). If the trial court, after considering these factors, determines that the trial would not be fundamentally fair, then the court may dismiss the charges. State v. Merriman, 410 S.W.3d 779, 785 (Tenn. 2013).

Based on State v. Tony Best, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529 (Tenn. Crim. App. Sept. 25, 2008), the State argues that it had no duty to preserve the hazardous contents of a methamphetamine lab. In Best, the appellant argued that the destruction of methamphetamine components found at the crime scene denied him the right to a fair trial because he was unable to test those components to show that his

fingerprints were not on them. Id. at *10. The trial court allowed the introduction of photographs of the methamphetamine components because the components themselves had to be destroyed for safety reasons. Id. at *14. In upholding the introduction of the photos, this court determined that the State had no duty to preserve the methamphetamine components because "[t]he duty to preserve evidence does not extend to that which the State cannot preserve." Id. (citing State v. Gilbert, 751 S.W.2d 454, 460 (Tenn. Crim. App. 1988)). The Best court likened situations where evidence is too dangerous to preserve to cases where evidence is consumed in testing, and explained as follows:

> Although [the precept that the State has no duty to preserve evidence it cannot preserve] was formulated in cases in which the evidence was consumed during testing, we conclude that it also must necessarily apply to evidence that is too dangerous to retain. In this regard, we note that many of the ingredients contained within the two plastic bins and the cardboard box had previously been opened and partially used. Detective Brown stated that when encountering such items, he had no way of knowing whether someone had mixed other chemicals with the contents of those substances and that mixed chemicals were not safe to store. Also, the methamphetamine components included Mason jars containing unknown liquids. Several of the items in the box, such as the blackened Pyrex dishes, the balled aluminum foil, and the stained wire strainer, suggest that methamphetamine production had been undertaken with these ingredients at some earlier time. Thus, the evidence in the record supports Detective Brown's testimony that the methamphetamine components had to be destroyed for the safety of the officers.

Id. (internal citations omitted).

Although the Petitioner rightfully acknowledges the above authority in his brief, he requests that this Court not apply it in this case. We decline the Petitioner's invitation, and conclude that the State did not have an affirmative duty to preserve the components of the methamphetamine lab. As in Best, several of the components were items commonly associated with the manufacturing of methamphetamine, including used Pyrex dishes, mason jars and other bottles containing liquids, multiple funnels, a turkey baster, lighter fluid, and the device that Detective Taylor testified was frequently used in the "gassing off" stage of methamphetamine production. This evidence, combined with the testimony of Detective Taylor that he found the Petitioner standing over lit burners heating liquid in Pyrex dishes, demonstrates that the items had been used in the process of attempting to manufacture methamphetamine. Detective Taylor further testified that he awaited the arrival of the Methamphetamine Task Force prior to removing any liquids, because the liquids were "hazardous material," and he was not trained in how to safely

-8-

handle such materials. Finally, the house was quarantined after the removal of the hazardous materials.

Under these circumstances, the State did not have a duty to preserve the components of the methamphetamine lab because they could not do so safely. See State v. Ernest Dodd, No. M2011-02259-CCA-R3-CD, 2013 WL 2296168, at *4-5 (Tenn. Crim. App. May 23, 2013), perm. app. denied (Tenn. Oct. 16, 2013) (citing Best and holding that the State did not have a duty to preserve components of a methamphetamine lab because the components were not material evidence and because the components could not be safely preserved for trial). Accordingly, the record supports the post-conviction court's determination that trial counsel was not deficient in failing to file a motion to dismiss or request a jury instruction based on the State's failure to preserve the components recovered from the methamphetamine lab. Because the Petitioner has failed to show deficient performance or prejudice arising therefrom, he is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE